663 So.2d 585 (1995)
QUICK CHANGE OIL AND LUBE, INC., and Hartford Accident and Indemnity Company
v.
Thomas Allen ROGERS, Jr.
No. 93-CC-00969-SCT.
Supreme Court of Mississippi.
November 9, 1995.
*587 George E. Read, Daniel Coker Horton & Bell, Oxford; Donald V. Burch, Daniel Coker Firm, Jackson, for Appellants.
Roderick D. Ward, III, Stevens & Ward, Jackson, for Appellee.
Before HAWKINS, C.J., and JAMES L. ROBERTS, Jr. and SMITH, JJ.
SMITH, Justice, for the Court:
This case comes to this Court on appeal of Thomas Allen Rogers, Jr. (Rogers) from the Circuit Court of Madison County. Rogers worked at Quick Change Oil and Lube, Inc. (Quick Change), where his duties involved changing oil and lubricating cars. Quick Change had a routine practice of allowing and encouraging its employees, if they found time, to help change the gas price sign of their neighboring business, Speedway. Speedway would pay any employee of Quick Change five dollars for volunteering a few minutes to change their gas price sign to reflect current prices. Rogers injured himself while changing Speedway's sign. Rogers' general employer, Quick Change, in an attempt to avoid workers' compensation coverage, argued that Rogers acted as a loaned servant to Speedway, and thus, was not in the course and scope of employment with Quick Change at the time of his injury so as to hold Quick Change liable. The Administrative Judge Neil W. White agreed. The full Workers Compensation Commission reversed, holding inter alia that since Quick Change had ultimate control, it was the employer for purposes of liability. The circuit court affirmed the Commission.
Aggrieved, Quick Change now perfects an appeal asking this Court to determine the single issue of whether Rogers was acting in the course and scope of his employment, or was a loaned servant of Speedway at the time of his injury. We hold that although the work performed might have benefited Speedway more than Quick Change, nonetheless, the work was performed on behalf of Quick Change. Speedway did not have ultimate, exclusive control over Rogers. Rogers did not act voluntarily because his actions were a reflection of his company's goodwill policy; thus Rogers was not a loaned servant. We must affirm the lower court.

STATEMENT OF FACTS
Thomas Allen Rogers worked for Quick Change, changing oil and lubricants in automobiles for approximately one year prior to the date he was hurt. Quick Change had a custom and a practice to help their adjacent neighboring business Speedway by changing Speedway's outdoor advertisement sign to reflect current gas prices. Quick Change owned a ladder which was used to reach the Speedway sign. Quick Change's employees carried it with them when a female employee of Speedway called for assistance. Charles Joiner, the manager of Quick Change, would, himself change the sign in a chivalrous effort to assist a female Speedway manager or employee.
Speedway would pay Quick Change employees the nominal sum of five dollars for changing the gasoline price on their sign. Rogers was paid five dollars on at least two prior occasions by Speedway. He never turned the money back over to Quick Change. Rogers testified that upon receiving the five dollars, he was required to sign a ticket acknowledging that he received payment. Quick Change consented to their employees helping Speedway because it engendered good relations between the two businesses. The two businesses had a camaraderie; Speedway employees received a two dollar commercial discount for using Quick Change to service their cars. Rogers testified that he would only agree to perform the Speedway work when all his Quick Change work was completed. He acknowledged that he was not compelled by Quick Change to replace the sign numbers for Speedway.
The sign, located on Speedway premises, was under the exclusive control of Speedway. Rogers was required to leave Quick Change premises and enter Speedway premises in order to change the sign. The Speedway manager would have to tell Rogers or another Quick Change employee what numbers *588 and colors to use in creating the new sign and furnish the numbers to be used. Rogers testified that he would have returned to Quick Change, in the event he was not needed by Speedway.
On the day in question, Speedway manager, Penny Van Devender, came to Quick Change and asked for help to change the Speedway sign. At first, another employee offered to help, but then declined. Rogers then agreed to go go Speedway to perform the requested task. While on the sign, Rogers fell and injured himself.
A hearing was held on April 14, 1992. The agreed and stipulated sole issue for determination by the administrative judge was whether or not Rogers' injury arose out of and in the course and scope of his employment with Quick Change or if in fact he was a borrowed servant at the time.
During Rogers' testimony concerning the incident, he indicated that his activities at Speedway were incidental to his employment with Quick Change. Rogers also stated that this gesture of goodwill was because Charles Joiner, manager of Quick Change, wanted to stay on good terms with Speedway given the fact that he had recently been through a lengthy and costly court battle over the property on which his business is located and Speedway had purchased the property. Another reason for showing goodwill was because it generated business from the adjacent businesses.
Rogers testified that Joiner told him that if Penny Van Devender or another employee of Speedway needed any help, he was to go help them. However, during cross examination, he stated that he was never told that he "must" go over and assist Speedway. Rogers stated, "No, sir, I was not forced." But he also stated that he did not know whether refusal to provide the extra help to Speedway would cause him to lose his job. He also stated that the five dollars payment was not necessary because he would have done the task for free, as long as Joiner wanted him to do it.
Charles Lester Joiner, Jr., manager of Quick Change, never considered the Speedway activities to be a part of the job requirements for Quick Change employees; he just wanted their conduct to be "neighborly." He mentioned that the changing of the gasoline prices on Speedway's sign had been an ongoing policy of goodwill since sometime after 1979. Joiner had loaned his ladder to Speedway for a number of years as an act of neighborly generosity. Joiner testified that he made it clear that no employees were required to assist Speedway, but, as long as it did not conflict with their work at Quick Change, they could help Speedway if they wanted to. He testified that the work done for Speedway was not a "material item," thus, he never took any employee off the payroll if he chose to lend assistance to Speedway. Joiner acknowledged that he always maintained ultimate control over Rogers in an employer/employee relationship.
Penny Van Devender, manager of Speedway, testified that she would decide when the sign was to be changed and if it were necessary to seek the assistance of someone at Quick Change to change the sign. She stated that the actual numbers and letters were supplied by Speedway, and it was up to her to instruct and direct the manner in which the sign would appear. She determined the time at which the sign would be changed since she had to initiate a request to Quick Change. She also testified that on the occasion at issue, she did not pay Rogers the five dollars as was customary because he was rushed to the hospital.
Following the hearing, the administrative judge entered an order on June 26, 1992, finding that the claimant did not sustain an accidental injury arising out of and in the course of his employment with Quick Change.
Rogers appealed to the Workers Compensation Commission, who reversed the administrative judge's order on March 29, 1993. The Commission found that the claimant's injury arose out of and in the course of his employment with Quick Change.
Quick Change and insurance carrier Hartford Accident and Indemnity Company appealed the order of the Commission to the Circuit Court of Madison County. The lower court affirmed the Commission. The lower court found that since Quick Change told its *589 employees not to neglect their primary duties in order to assist Speedway, Quick Change necessarily retained control over the timing and circumstances under which its employees could assist Speedway. Furthermore, the lower court opined that by virtue of the fact that Quick Change acted generously and provided the ladder to accomplish Speedway's request, it was logical to conclude that Quick Change provided the tools necessary. Under this thinking, the lower court judge equated Quick Change's ladder loan as a maneuver on their part to retain control over the means and methods used by Rogers, thus, negating a finding of the "loaned servant" status. The lower court also found that the five dollars was more of a gratuity as opposed to a wage, and insufficient to establish an employer-employee relationship between Rogers and Speedway.

DISCUSSION OF LAW

WHETHER APPELLEE WAS IN THE COURSE AND SCOPE OF HIS EMPLOYMENT WITH QUICK CHANGE OIL AT THE TIME OF HIS INJURY OR WAS A LOANED SERVANT OF SPEEDWAY AT THE TIME OF HIS INJURY.
The loaned servant doctrine has long been recognized in Mississippi Workers' Compensation Law. This Court recently in Northern Electric Co. v. Phillips, 660 So.2d 1278 (Miss. 1995), revisited this doctrine and reaffirmed its earliest pronouncement of this principle stating:
[I]f one person lends his servant to another for a particular employment, the servant for anything done in that employment, is dealt with as the servant of the one to whom he had been lent, although he remains the general servant of the person who lent him. The fact that a person is the general servant of one employer does not, as a matter of law, prevent him from becoming the particular servant of another, who may be held liable for his acts. We noted that `it is well settled in other states that a person in the employ of one person or company whose services are loaned by his employer to another company or person becomes, for the purpose of the work assigned to him, the servant of the latter company for whom the work is performed.'
Northern Electric Co., at 1281, citing Runnels v. Burdine, 234 Miss. 272, 276, 106 So.2d 49, 51 (1958).
The general rule, as applied at common law, is that a servant, in general employment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant to the borrower, although he remains in the general employment of the lender. The borrower then becomes the employer to the exclusion of the lender. Application of the rule depends upon the question of whose work is being performed, and if the lender is to escape liability, it must appear that the servant is under the borrower's exclusive control and direction as to the work in progress. When an employee voluntarily accepts and enters upon such an assignment, he ceases to be in the course of the employment by the lender or the general employer. However, while the "loaned servant" doctrine is generally considered applicable in the compensation field, a shift of emphasis will be noted as to the three pertinent questions involved, viz: (1) whose work is being performed, (2) who controls or has the right to control the workman as to the work being performed, and (3) has the workman voluntarily accepted the special employment.

Dunn., Mississippi Workers' Compensation Law § 186 (1986) (emphasis added).
Under the loaned servant doctrine, if Quick Change had loaned its servant Rogers to Speedway, even though Quick Change was the general employer, Rogers can become a servant for Speedway, who may be liable for his acts. In order to make this finding, an inquiry must be made as to whose work is being performed and, if Quick Change is to escape liability, it must appear that Rogers is under Speedway's exclusive control and direction as to the work in progress.
In examining this question it appears at first glance that it is Speedway whose work is being performed here. It has not been established that Quick Change has anything *590 to gain by changing the sign prices for Speedway, other than that personal satisfaction that comes from helping someone. However, from the record, it is unclear as to whether Speedway employees were lured to Quick Change for service on their cars due to Quick Change's many acts of kindness or the discounts to the businesses in the area. In that light, this Court cannot unequivocally say that Quick Change's goodwill policy generated more business for itself, and thus, answer the question of whose work was being performed to include both Quick Change and Speedway.
The record reveals that the Speedway sign only advertised matters pertaining to Speedway and the prices displayed on the sign were solely for the purpose of informing the public as to the prevailing prices at Speedway, and nothing on the sign was meant to promote any business for Quick Change. The only beneficiary of changing the prices was Speedway. Thus, under these limited facts, it was only Speedway's work which was being performed.
However, looking at the entire history between Speedway and Quick Change, as a whole and not just this one isolated event, it is absolutely clear that Rogers' actions reflect the will of Quick Change. This Court, in Big "2" Engine Rebuilders v. Freeman, 379 So.2d 888, 891 (Miss. 1980), citing Larson, Workmen's Compensation Law § 27.22(b) (Cum.Supp. 1979), stated that:
[i]njuries resulting from similar well-intentioned humanitarian acts have been found compensable in other states. (Citation omitted). We note also that universally recognized, small, non-deviant charitable activities promote the employer's interest and public relations.
Big "2" Engine, 379 So.2d at 891.
Thus, because the entire record reveals that Quick Change promoted charitable activities for Speedway, its employee Rogers should be covered when performing such acts of kindness.
This Court, in Persons v. Stokes, 222 Miss. 479, 76 So.2d 517, 519 (1954) held:
[I]t may be stated as a very general proposition that an injury occurs `in the course of' the employment when it takes place within the period of the employment, at a place where the employee reasonably may be in the performance of his duties, and while he is fulfilling those duties or engaged in doing something incidental thereto, or as sometimes stated, where he is engaged in the furtherance of the employer's business. (Citation omitted). An injury is said to arise in the course of the employment when it takes place within the period of the employment, at a place where the employee reasonably may be, and while he is fulfilling his duties or engaged in doing something incidental thereto. (Citation omitted).
In the case sub judice, Rogers' injury arose in the course of his employment with Quick Change. He was at a place where a Quick Change employee might have been expected. Rogers' boss, Joiner, knew and expected that his employees should follow his lead in helping their neighbor Speedway post new gas prices. Even though this was not Rogers' primary purpose in working at Quick Change, this was an incidental duty fostered through an ongoing public relations campaign by his general employer. Regardless of the fact of whether this charitable act actually furthered Quick Change's business, Rogers reasonably perceived his assistance was expected and that it was helpful to Quick Change's business reputation in the community. Even though Quick Change claims Rogers was never "required" to help Speedway, it is hardly deniable that employees of Speedway were at least "expected" to render assistance as a goodwill gesture.
In Persons, this Court also held:
A compensable injury must arise not only within the time and space limits of the employment, but also in the course of an activity related to the employment. An activity is related to the employment if it carries out the employer's purposes or advances his interests directly or indirectly. If a servant steps aside from the master's business for some purpose of his own disconnected from his employment, the relationship of master and servant is temporarily suspended and `this is so no *591 matter how short the time, and the master is not liable for his acts during such time.'
Persons, 76 So.2d at 519 (emphasis added).
Again, with the facts at bar, Rogers' injuries are compensable because they occurred in an activity related to his employment. Rogers carried out his employer's purpose of goodwill and advanced Joiner's interests, indirectly, if not directly. Quick Change expected its employees to help the neighbors; thus, when its employees acted in accordance with this goal or purpose, they were, in effect, doing Quick Change's bidding, not that of Speedway. Rogers' decision to help Speedway was not totally voluntary, nor was it "disconnected with his employment." The record is devoid of any suggestions that Rogers' actions were selfish or that he had anything to gain by helping Speedway. However, the record is more than sufficient to suggest that Rogers' actions were done for his employer, and thus, he was acting in the scope of his employment. Accordingly, Rogers was entitled to Workers' Compensation benefits from his general employer.
This Court, in Luther McGill, Inc. v. Bradley, No. 90-CA-1206-SCT, slip op. at 4 (Miss. June 30, 1994) stated:
In determining whether or not ... employees were loaned servants, [courts should primarily rely] on the factor of control over the employee's work. [T]he central question in borrowed servant cases is whether someone has the power to control and direct another person in the performance of his work. (Citation omitted). [T]he factor of control is perhaps the most universally accepted standard for establishing an employer-employee relationship... . Control has been further defined as involving a `careful distinction ... between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.'
The case at bar also requires this Court to make another careful distinction as to whether Quick Change was ultimately the one in control of Rogers.
In Clark v. Luther McGill, 240 Miss. 509, 127 So.2d 858, 862 (1961), this Court in considering this issue noted that:
The ultimate right to control should not be confused with immediate control, for it is the reserved right of control rather than its actual exercise that furnishes the true test of relationship; and he is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate results and in all its details, and the fact that the borrower gives information and directions to the servant as to the details of the work or the manner of doing it does not make the general servant of the employer the servant of the borrower.
The language of Clark squarely fits the facts in the case sub judice. The fact that Speedway exercised immediate control over Rogers' activities on the price sign should not be confused with the ultimate right of control that Quick Change had over Rogers. It was Quick Change's policy which drove Rogers to volunteer a few minutes of his time to change the Speedway sign. He was only doing that which was expected of him; he was only emulating his boss and living up to his company's policy of goodwill.
The ultimate answer to this question must turn on this Court finding "who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate results." Clark v. Luther McGill, 240 Miss. 509, 127 So.2d 858, 862 (1961). In the case sub judice, it is Quick Change who had the supreme choice. It was their policy of goodwill which influenced Rogers to help Speedway. Quick Change's policy put into motion a chain of events where if Rogers chose not to help, perhaps there would be no consequences, but if he chose to help, then his actions would certainly bring favor upon him from Joiner for maintaining the company's reputation for being a good business neighbor.
What is of consequence in this decision is the fact that Quick Change had a habit of performing a relatively dangerous act in its effort to help Speedway. Rogers acted in conformity with this practice and injured himself. Even though Speedway was *592 the ultimate and primary beneficiary of Quick Change's policy and Rogers' actions, it was Quick Change's will and policy that Rogers was serving by helping Speedway. Thus, it was Quick Change who had the supreme choice and must bear the responsibility. Joiner could have controlled and directed Rogers to just keep changing the oil and lubricating the cars, and not concern himself with the dilemma of Speedway. But such was not the case. Joiner's own testimony reveals that his employees were permitted to help Speedway when they had extra time. Joiner himself often performed the requested task. It would be contradictory for Joiner to now argue that he did not expect his employees to help Speedway since he had given them permission to do so. Thus, it was Quick Change who had the ultimate reserved right of control.
This Court has stated in Mississippi Export R.R. Company v. Temple, 257 So.2d 187, 190-91 (Miss. 1972) that:
In order to be a loaned servant, the relationship requires that the employee submit himself to the direction and control of the other employer with respect to the work to be done. If, however, the original employer retains control over the means and method of the work done, the employee does not become a "loaned servant" although he is temporarily working on the job of another employer. The borrowed employer must have exclusive control and direction over the particular work in progress. The test is whether, in the particular service which he is engaged to perform, he continues liable to the directions and control of his master, or he becomes subject to that of the party to whom he is lent or hired. (Citation omitted).
In the case sub judice, there was little control over Rogers by Quick Change when he left the property to help Speedway. The sign was under the exclusive control of Speedway. It was located on their premises. The Speedway manager would have to instruct Rogers or another Quick Change employee what numbers and colors to use in creating the new sign, and furnish the numbers to be used.
However, looking at the situation in its entirety, Speedway did not have exclusive control and direction over Rogers. Rogers was never completely subject to Speedway. Though he, himself, may not have chosen to leave once he started toward completing the requested task, it is clear that Quick Change could have summoned Rogers to return to its premises, and he would have come back. No one at Speedway had "exclusive control" over any Quick Change employee. Speedway never forced them to come over, fix the sign, and remain on the sign until the Speedway manager said they could leave. Speedway could merely ask, and hope that someone, not necessarily Rogers, would eventually come over. There was no exclusive control over Rogers, in fact, Rogers was not even the first person who offered to help Speedway. He did so only because another Quick Change employee felt sick and defaulted. Moreover, just the fact that another Quick Change employee initially sought to help Speedway on this occasion establishes that Quick Change employees perceived that they were "expected" to help their neighboring businesses. Therefore, Rogers was technically liable to the directions and control of Quick Change, not Speedway, since his actions were more of an effort to further Quick Change's public relations campaign, as opposed to genuinely helping Speedway reflect the prevailing prices of gas. This Court, in Index Drilling Company v. Williams, 242 Miss. 775, 137 So.2d 525, 529 (1962) stated:
[T]here is a presumption of the continuance of the general employment. To overcome this presumption there must be `a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control the details of the work.'
As in Index Drilling Company, even though it might appear that the work was being done solely for the benefit of Speedway and that Speedway directed just how the sign should read, there is still not a "clear demonstration" that Speedway, was substituted *593 for Quick Change as Roger's employer. Considering the facts at bar, there was no contract between Speedway and Rogers; it was just assumed that Rogers, Joiner, or another employee would help if they found the time. In reward for their time, a modest sum of five dollars would be given them. An employee, any employee, could have helped, and would have received the nominal five dollars. This simply was not a contract. In respect to workers compensation, a loaned servant does not become employee of the special employer unless a contract of hire is entered into between the employee and borrowing employer and such contract may be express, or implied, but there must be consent thereto by employee and such consent may be implied. Clark v. Luther McGill, 127 So.2d at 862 (Miss. 1961).
This Court agrees with the lower court that the five dollars was more a gratuity than a wage. Rogers even stated that he would have done the task for free, as long as Joiner wanted him to do it. Under these facts, there simply is not any contract of hire between Rogers and Speedway. Thus, we find this to be another reason not to confer "loaned servant" status upon Rogers. The presumption of continuance of general employment under these facts is unrebutted.
In Index Drilling Co. v. Williams, the claimant Williams, who generally worked for Production, Inc., had never entered into a contract of hire temporarily with Index Drilling Co., a sister corporation to Production. Williams was paid by Production, and his general foreman, Walters, directed Production's work. Williams was told by his superior to help unload a truck, which he found was an Index truck when he went to the location of the unloading. He was hurt while unloading this Index truck.
This Court, in Index Drilling Co., found the evidence insufficient to indicate a new temporary employer had been substituted for an old one. The Court stated, "There was no showing of a deliberate and informed consent by the employee to a new employment." Index Drilling Co., 137 So.2d at 530.
In the same vein, there is a continuous employment between Quick Change and Rogers. Just because Joiner encouraged his employees to lend a helping hand to Speedway is insufficient to indicate that Speedway is a new temporary employer. Surely, if Rogers had known that he would be Speedway's employee every time he went over there to assist in changing the sign, and if he were informed that that meant that his general employer's workmen's compensation carrier would not cover any injuries, it is doubtful that he would have consented to such an arrangement. Thus, Rogers' decision to participate in helping Speedway cannot be deemed consent by him to a new employment.
Finally, this Court must examine whether Rogers voluntarily accepted the special employment. In Persons v. Stokes, 222 Miss. 479, 76 So.2d 517 (1954), the Court held that a claimant's injuries were not in the scope of the employment when that claimant abandoned the original purposes of his employer and decided to go squirrel hunting on the employer's premises. In Persons, this Court held:
the employer did not require, foster, or encourage the hunting of squirrels by his employees while on the job and there is no proof that the employer permitted promiscuous hunting in the pasture to which he sent the appellee on the occasion in question. There was no casual connection between his injury and the employment.
76 So.2d at 519-20 (emphasis added).
Although Persons v. Stokes did not deal with the loaned servant doctrine, there is a great deal of instruction that may be gleaned from that decision. Quick Change, like Persons, may not have "required" or "forced" Rogers to assist Speedway; however, unlike Persons, Quick Change "permitted," "fostered," and "encouraged" the assistance of any of its employees to change Speedway's signs when requested. This goodwill policy had been in effect since 1979. It would certainly be inconsistent for Joiner to argue that he had this existing goodwill policy toward Speedway, yet when his employees acted in conformity with said policy that they were acting out of their own free will in volunteering help to Speedway. When Joiner states that he told his employees that they *594 could help Speedway so long as it did not conflict with their duties at Quick Change, never once docking his employees wages for the time they spent at Speedway, Joiner was essentially admitting that he "permitted" his employees to leave his business to serve the interests of Speedway. Joiner did more than consent to his employees activities at Speedway; he encouraged it because it furthered his ongoing streak of benevolence. In this case, there is more than a "casual connection" between the injury and the employment. But for Quick Change's existing policy to help Speedway, Rogers probably would not have proceeded to help change the sign, and thus, his injuries could have been avoided. If the goodwill policy had not been in place and Rogers had chosen on his own accord to help Speedway, the outcome of this case would have been different. However, this is a fact-driven case and under the facts presented sub judice, it is illogical to assume that Rogers was helping Speedway for his own good health!
Though goodwill is a non-quantifiable term and may be of inconsequential value to Quick Change; nevertheless, it is obvious that there was no need or obligation for Quick Change to help Speedway. Yet, Quick Change undertook a policy of helping thy neighbor, and therefore, should underwrite any consequences stemming from that decision.
Moreover, it is doubtful that an employee in Rogers' position would have dared disregard company policy, refuse to render aid to the neighboring business, and still go on about his work undisturbed. The fact that there is an existing goodwill campaign, and Rogers attempted to further that policy, is far more dispositive than the fact that Speedway was the primary beneficiary and may have controlled the re-arranging of the figures and letters by Rogers and other Quick Change employees when changing the sign.

CONCLUSION
Although the issue presented this Court was an extremely close question, nevertheless, in our analysis of the situation, it is apparent that Quick Change had a policy of goodwill toward its business neighbors, and this policy included changing the outdoor advertisement sign for Speedway. It is equally apparent that Quick Change employees were expected to help foster the goodwill policy. Such is the linchpin of the entire case. The ultimate right of control over Rogers remained exclusively with Quick Change. Because Rogers acted in conformity with his general employer's dictates, he acted in the course and scope of his employment, and was not a loaned servant to Speedway. Thus, Hartford Accident and Indemnity Co., the workers' compensation carrier for Quick Change, is liable for the injuries of Thomas Allen Rogers, who was doing exactly that which was expected of him. We affirm the judgment of the lower court.
JUDGMENT AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
McRAE, J., dissents with separate written opinion joined by SULLIVAN, J.
McRAE, Justice, dissenting:
In the interest of encouraging some degree of consistency in our decisions, I respectfully dissent. We recently handed down Northern Electric Company v. Phillips, 660 So.2d 1278 (Miss. 1995), wherein we held that Kelly Services, a labor services broker, was solely liable for workers' compensation benefits because Phillips was a "loaned" or "borrowed" employee of Northern Electric. In this case, where the facts clearly show Rogers to be a loaned servant to Speedway, we now hold that he was not loaned or borrowed and find his employer, Quick Change, to be liable. Because the inconsistency of our application of the loaned servant doctrine, particularly with regard to the element of control, is troublesome, I respectfully dissent.
Rogers, an employee of Quick Change Oil and Lube, was injured while changing the sign for the neighboring Speedway business. Rogers and other Quick Change employees were paid directly by Speedway to perform this task, which Rogers stated he did only after completing his daily duties at Quick Change. The work was performed on the *595 Speedway premises, where Rogers was solely under that business' direction and control. While the majority acknowledges that it was only Speedway's work that Rogers performed, it concludes that because providing an employee to change the sign engendered good relations between Speedway and Quick Change, "its employee Rogers should be covered when performing such acts of kindness." Slip op. at 9. It further characterizes changing the prices on the Speedway sign as an "incidental duty" of Quick Change Employees.
Compare and contrast these facts with those of Northern Electric. Bertis Phillips was injured while working on a job for NECO. His employment at NECO was contracted through Kelly Services, which paid his salary and benefits from monies it received from NECO. He performed the same tasks as regular NECO employees and was subject to direct supervision by NECO personnel.
In Northern Electric, we proclaimed Phillips to be a borrowed servant or a "dual employee" for purposes of finding both NECO and Kelly Services immune from common law tort liability and limiting his recovery to Kelly Services' workers' compensation policy. Nevertheless, in the case sub judice, where Rogers was even paid directly by Speedway for the work he performed, he was found not to be a borrowed or loaned servant, but instead, acting in conformance with Quick Change's wishes, making Quick Change's workers' compensation carrier liable for his injuries.
Because the discrepancies in these opinions, decided only weeks apart, serve only to muddle the law, I respectfully dissent.
SULLIVAN, J., joins this opinion.